UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/10/2022

STEPHANIE RUIZ GUEVARA and
SANDRA HERAS, *on behalf of themselves,
FLSA Collective Plaintiffs and the Class*,

                         Plaintiffs,

-against-

FINE & RARE OPERATIONS LLC d/b/a
FINE & RARE, FLATIRON ROOM
OPERATIONS LLC d/b/a THE FLATIRON
ROOM, GOODNIGHT GROUP LLC, and
THOMAS TARDIE,

                         Defendants.

20-CV-5330 (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs Stephanie Ruiz Guevara and Sandra Heras were employed by Fine & Rare

Operations LLC (F&R LLC) and worked at Fine & Rare restaurant (Fine & Rare), located at 9

East 37th Street in Manhattan. Guevara was a busser for approximately three months, from

November 2019 to February 2020. *See* First Amended Complaint (FAC) (Dkt. No. 42) ¶ 30(a).

Heras alleges that she was a server and food runner from June 2017 to August 2019. FAC ¶ 31(a).

Fine & Rare is promoted as part of the Goodnight Group "family of venues," which also includes

a second restaurant, The Flatiron Room (Flatiron Room), located at 37 West 26th Street in

Manhattan.[1] Alleging that both restaurants are owned and controlled by Thomas Tardie and are

operated as a "single integrated enterprise," FAC ¶¶ 10, 13, plaintiffs brought this action on behalf

of themselves and others similarly situated against F&R LLC, Flatiron Room Operations LLC

d/b/a The Flatiron Room (FIR LLC), Goodnight Group LLC (collectively the Corporate

---

[1] *See* Goodnight Group, https://goodnightgroup.nyc/ (last visited Jan. 10, 2022); Fine & Rare,
https://fineandrare.nyc/ (last visited Jan. 10, 2022); The Flatiron Room,
https://www.theflatironroom.com/ (last visited Jan. 10, 2022).

Defendants), and Tardie, alleging that defendants violated the minimum wage, overtime, tip-pooling, meal credit, spread-of-hours, wage notice, and wage statements provisions of the Fair Labor Standards Act (FLSA), the New York Labor Law (NYLL), and their implementing regulations. *See* FAC ¶¶ 43-63.

Now before the Court is plaintiffs' motion (Mot.) (Dkt. No. 60) for an order: (1) granting conditional certification of plaintiffs' FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of "themselves and all current and former non-exempt employees (including but not limited to delivery persons, waiters, bartenders, barbacks, runners, bussers, cooks, food preparers, dishwashers, porters or hosts), employed by Defendants for the six (6) year period prior to the filing of the Complaint"; (2) directing defendants to provide the names and contact information of all potential collective members to plaintiffs' counsel; (3) approving plaintiffs' proposed Notice of Pendency of Lawsuit Regarding Wages (Notice) (Dkt. No. 61-1), authorizing plaintiffs to mail it to potential collective members (in English and Spanish), and directing defendants to post it in both restaurants; and (4) tolling the statute of limitations "until such time that Plaintiff is able to send notice to protentional opt-in plaintiffs." Mot. Ex. 1 (Dkt. No. 60-1), at 1-2; *see also* Pl. Mem. (Dkt. No. 61) at 1, 14-23.

For the reasons set forth below, plaintiffs' motion will be granted in part.

## I.     BACKGROUND

### A.     Plaintiffs' Claims

Except where otherwise indicated, the facts set forth herein are taken from the declarations submitted by each plaintiff, and by their counsel, in support of the collective certification motion. Plaintiff Guevara was employed by F&R LLC as a busser at Fine & Rare from November 2019 through February 2020. Guevara Decl. (Dkt. No. 63) ¶¶ 1, 4. Plaintiff Heras attests that she was

employed by F&R LLC as a server and food runner at Fine & Rare from June 2017 through August 2019. Heras Decl. (Dkt. No. 64) ¶¶ 1, 4.[2] Neither plaintiff ever worked at Flatiron Room.

Both plaintiffs complain that their employer improperly deducted an hourly tip credit and a per-shift meal credit from their wages in violation of relevant provisions of the FLSA and related regulations. Specifically, both attest that they were paid the "tip credit minimum wage," Guevara Decl. ¶ 6; Heras Decl. ¶ 6, but were required to engage in non-tipped "side-work," such as preparing food, making coffee, polishing silverware, restocking the bathrooms, and taking out the garbage, for twenty percent or more of their workday. Guevara Decl. ¶ 8; Heras Decl. ¶ 9. The FLSA, 29 U.S.C. § 203(m)(2)(A), "permit[s] an employer to pay a tipped worker a cash wage that is lower than the statutory minimum wage, provided that the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage." *Inclan* v. *N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015). "[W]hen 'an employee performs both tipped and untipped work, the question of whether an employer is entitled to apply a tip credit for minimum wage purposes turns on whether the employee spends more than twenty percent of his or her work week performing non-tipped work. If so, the employer is not entitled to apply a tip credit, and must pay that employee the full minimum wage.'" *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 500 (S.D.N.Y. 2017) (quoting *Islam* v. *BYO Co. (USA)*, 2017 WL 2693717, at *4 (S.D.N.Y. June 20, 2017)), *aff'd*, 752 F. App'x 33 (2d Cir. 2018).

Both plaintiffs further attest that they were subjected to an "illegal tip pooling system" in which the managers, who were paid on a salary basis, also participated. Guevara Decl. ¶ 10; Heras

---

[2] This appears to be inaccurate. Plaintiff Heras's pay records, as well as an email she wrote to Fine & Rare General Manager Dasha Naymon on August 24, 2018, reflect that she voluntarily left her employment in August 2018. (Dkt. Nos. 82-1, 82-2.) Nonetheless, because the motion before me seeks only conditional certification of an FLSA collective, I accept, for present purposes, that Heras worked at Fine & Rare through August 2019. *See* Part II(A), *infra*.

Decl. ¶ 11. In addition, plaintiff Heras asserts that she was never given "proper written or oral notice that a tip credit was being taken from my wages." Heras Decl. ¶ 8.[3] Guevara makes no comparable claim regarding lack of notice of the tip credit.[4] Under the FLSA, the tip credit "shall not apply with respect to any tipped employee unless "all tips received by such employee have been retained by the employee," and the employee "has been informed by the employer of the provisions of this subsection." 29 U.S.C. § 203(m)(2)(A). While tip pooling among tipped employees is permissible, the employer may not "allow[ ] managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." *Id*.; *see also* 29 C.F.R. § 531.54 (tip pool must be "limited to employees who customarily and regularly receive tips" and may not include "managers and supervisors"). The FLSA's tip credit notice provision "does not require that the notice be given in writing," *Hernandez v. Jrpac Inc.*, 2016 WL 3248493, at *23 (S.D.N.Y. June 9, 2016), but does require the employer to "show that it has informed employees that tips are being credited against their wages." *Inclan*, 95 F. Supp. 3d at 497 (quoting *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 403 (3d Cir. 1994)).

Plaintiffs Guevara and Hera also attest that they had a meal credit automatically deducted from their wages each shift, without regard to whether the deduction exceeded the meal's "reasonable cost" or whether the meal "satisfied New York State's nutritional requirements containing all four (4) food groups." Guevara Decl. ¶ 11; Heras Decl. ¶ 12. Plaintiffs do not claim

---

[3] This appears to be inaccurate. Plaintiffs have submitted a written wage notice dated May 5, 2017, countersigned signed by Heras, informing her that a tip credit of $3.50 per hour and a meal credit of $2.85 per meal were to be deducted from her cash wages. (Dkt. No. 80-1.) Additionally, defendants have submitted samples of Heras's paychecks, including one from 2017 and one from 2018. (Dkt. No. 82-1.) Her 2017 paycheck shows that her regular hourly rate was $11, less a $3.50 tip credit, for a cash wage of $7.50 per hour. Her 2018 paycheck shows that her regular hourly rate was $13, less a $4.35 tip credit, for a cash wage of $8.65 per hour.

[4] Plaintiffs have submitted samples of Guevara's paychecks from 2019 and 2020. (Dkt. 61-8.) They show that that her cash wage was $10 per hour, after a $5 tip credit.

that the meal cost less than the deduction. However, Heras attests that the food was "almost always unhealthy fried food," served without vegetables or fruits, and that plaintiffs were only given water to drink. Heras Decl. ¶ 13. Guevara states that the food "would taste terrible, and was usually unhealthy," Guevara Decl. ¶ 12, but does not elaborate. Under the FLSA, 29 U.S.C. § 203(m)(1), an employer may deduct the "reasonable cost" of "board" (meals) that it customarily furnishes to its employees from their cash wages, but the meal credit may only be taken "if it complies with federal and state law." *Luo v. Panarium Kissena Inc.*, 2020 WL 9456895, at *4 (E.D.N.Y. Sept. 16, 2020) (citing 29 C.F.R. § 531.31), *report and recommendation adopted sub nom. Jing Fang Luo v. Panarium Kissenna, Inc.*, 2021 WL 1259621 (E.D.N.Y. Apr. 6, 2021). Under federal law, the deduction may not exceed the meal's "actual cost." 29 C.F.R. § 531.3(a). Under New York law, the meal must include "adequate portions of a variety of wholesome nutritious foods," including fruits or vegetables; grains or potatoes; eggs, meat, fish, poultry, dairy or legumes; and tea, coffee, milk, or juice. 12 N.Y.C.R.R. § 146-3.7.

In addition to the FLSA violations summarized above, plaintiffs claim that their employer violated various notice requirements imposed by state law. Both attest that they were not given any written wage notice at the beginning of their employment, as required by the Wage Theft Prevention Act, NYLL § 195(1). Guevara Decl. ¶ 13; Heras Decl. ¶ 16.[5] Further, although both concede that they received written wage statements with their weekly paychecks, as required by NYLL § 195(3), Guevara asserts that her wage statements were inaccurate because of the invalid tip credit and improper meal deduction. Guevara Decl. ¶ 14. Heras asserts that her wage statements

---

[5] As noted above, this appears to be inaccurate, at least as to plaintiff Heras. During a conference on January 6, 2022, plaintiffs argued that although Heras received a wage notice at the commencement of her employment, the notice was out of compliance with New York law because it improperly calculated the then-applicable tip-credited regular and overtime minimum wage.

were inaccurate because they "failed to state the correct number of hours that I worked each week." Heras Decl. ¶ 17. However, she does not explain how or in what way the hours stated were incorrect.[6] Heras adds that she "regularly" worked shifts exceeding ten hours but was not provided with the extra "spread-of-hours" pay (one extra hour, at minimum wage) required by 12 N.Y.C.R.R.§ 146-1.6. Heras Decl. ¶ 15.

### B.    Procedural Background

Plaintiff Guevara filed this action on July 10, 2020 (Dkt. No. 1), and amended her pleading, adding Heras as a second plaintiff, on June 8, 2021. On August 10, 2021, plaintiffs filed their motion for conditional collective certification, accompanied by their memorandum of law, their own declarations, and the declaration of their attorney C.K. Lee (Lee Decl.) (Dkt. No. 62), authenticating various exhibits. On September 14, 2021, defendants filed an opposition memorandum (Def. Mem.) (Dkt. No. 68) supported by the declaration of Dasha Naymon (Naymon Decl.) (Dkt. No. 67-1). Naymon is now the Director of Operations at Goodnight Group LLC and FIR LLC as well as the General Manager of F&R LLC.  Naymon Decl. ¶¶ 1, 5. On September 29, 2021, plaintiffs filed a reply memorandum. (Pl. Reply) (Dkt. No. 69.)

On January 5 and 6, 2022, in advance of a status conference scheduled for January 6, 2022, plaintiffs and defendants submitted letters attaching documents regarding plaintiff Heras's wages and hours. (Dkt. Nos. 80, 82.) At the January 6 conference, the parties agreed that the Court could consider those letters, and attached documents, in connection with the pending collective certification motion.

---

[6] In the FAC, plaintiffs allege that defendants "had a policy and practice of time-shaving," resulting in a "failure to pay Plaintiffs and FLSA Collective Plaintiffs for all of their hours worked," including overtime hours. FAC ¶¶ 47-48. However, there is not a word about time-shaving in either plaintiff's declaration.

## II.    DISCUSSION

### A.    Legal Standards

The FLSA provides that "any one or more employees" may bring an action against an employer "for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). To become parties to such an action, employees other than the named plaintiff(s) must "opt in" by filing written consents in the court in which the action is brought. *Id.* "Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (quoting *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).

Courts in this Circuit apply a "sensible" two-step method for determining whether to exercise this discretion. *See Myers*, 624 F.3d at 554-55. In the first step – commonly if somewhat imprecisely known as "conditional certification" – the named plaintiffs must make a "'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law,'" *id.* at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)), at which point the trial court may send (or direct plaintiffs' counsel to send) a notice to potential opt-in plaintiffs. *Id.* At the second stage, which typically occurs after discovery is completed, the court determines whether the plaintiffs who opted in are in fact "similarly situated" to the named plaintiffs. *Id.* If not, the court may "de-certif[y]" the collective and dismiss the opt-in plaintiffs' claims without prejudice. *Id.*

During the initial conditional certification stage, the requirement of a "modest factual showing" cannot be satisfied solely by the "unsupported assertions" in the plaintiffs' pleading. *Myers*, 624 F.3d at 555, or by allegations made on "information and belief." *McGlone v. Cont. Callers, Inc.*, 867 F. Supp. 2d 438, 444 (S.D.N.Y. 2012). Evidence is required. *Id.*; *see also Cuaya*

*v. VI Dev. Grp., LLC*, 2020 WL 5494371, at *3 (S.D.N.Y. Sept. 10, 2020) ("a plaintiff must offer 'actual evidence of a factual nexus' between his situation and those of other allegedly similarly situated employees" (quoting *Qing Gu v. T.C. Chikurin, Inc.*, 2014 WL 1515877, at *3 (E.D.N.Y. Apr. 17, 2014)); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (denying conditional collective certification where plaintiffs "offered no admissible evidence" to support contention made in complaint); *Prizmic v. Armour, Inc.*, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006) ("[m]ere allegations in the complaint are not sufficient; some factual showing by affidavit or otherwise must be made") (quoting *Camper v. Home Quality Mgmt. Inc.,* 200 F.R.D. 516, 519 (D. Md. 2000)).

However, because the purpose of this first stage is "merely to determine *whether* 'similarly situated' plaintiffs do in fact exist," plaintiffs have a low burden of proof. *Prizmic*, 2006 WL 1662614, at *2 (emphasis in the original); *accord Damassia v. Duane Reade, Inc.*, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006) (quoting *Wraga v. Marble Lite, Inc.*, 2006 WL 2443554, at *1-2 (E.D.N.Y. Aug. 22, 2006)) ("[A] plaintiff's burden at this preliminary stage is 'minimal.'"). A showing that plaintiffs themselves "were subjected to certain wage and hour practices at the defendants' workplace and to the best of their knowledge, and on the basis of their observations, their experience was shared by members of the proposed [collective]" is a sufficient basis from which to infer the "common policy" required for conditional certification. *Cortes*, 2015 WL 7076009, at *3 (citing *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007)). Documents properly considered in this inquiry "include plaintiffs' 'own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members.'" *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 557-58 (S.D.N.Y. 2013) (quoting *Hamadou*, 915 F. Supp. 2d at 661).

Consistent with the "minimal" burden of proof assigned to plaintiffs at the conditional certification stage, the court "should not weigh the merits of the underlying claims," *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) (citing *Lynch v. United Servs. Auto Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)), and should not "resolve factual disputes, decide substantial issues going to the ultimate merits, or make credibility determinations." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 158 (S.D.N.Y. 2014) (internal quotation marks omitted). Accordingly, where there is a conflict between the parties as to the facts underlying plaintiffs' wage and hour claims, the court should treat plaintiffs' attestations as true. *See Cortes v. New Creators, Inc.*, 2015 WL 7076009, at *1 n.1 (S.D.N.Y. Nov. 12, 2015).

In cases involving employees at multiple business locations, "courts consider whether the plaintiffs have made an adequate factual showing to support an inference that . . . a uniform policy or practice exists, and whether the locations share common ownership or management." *Trinidad*, 962 F. Supp. 2d at 558 (quoting *Hamadou*, 915 F. Supp. 2d at 662); *see also Rosario v. Valentine Ave. Disc. Store, Co., Inc.,* 828 F. Supp. 2d 508, 516–17 (E.D.N.Y.2011) (collecting cases). Both showings are required; that is, even where it is clear that multiple business locations share common ownership and management, plaintiffs must adduce enough evidence to support an inference of a common *wage policy* across all locations before a multi-location collective may be certified. *See*, *e.g.*, *Trinidad,* 962 F. Supp. 2d at 558-60 (declining to authorize notice to all Pret a Manger restaurant locations in New York City, or even to the full list of locations at which the named plaintiffs had worked, because "plaintiffs have not demonstrated across all locations a uniform policy of failure to pay overtime compensation"); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (E.D.N.Y. 2008) (conditionally certifying a group of employees at one pizza store, but declining to include employees at five other stores in the same chain where plaintiffs made

only "generalized allegations of wrongdoing" regarding one of the stores, supported by hearsay statements of questionable reliability); *cf. Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 270–71 (S.D.N.Y. 2012) (plaintiffs' assertions that they received "purely 'straight time' pay in the same distinctive manner . . . no matter where they worked or who supervised them" supported "a reasonable inference that plaintiffs' experiences reflected a company-wide policy").

### B. Plaintiffs' Factual Showing

As noted above, both plaintiffs attest that they worked at Fine & Rare; that they were paid a tip-credited minimum wage but were required to engage in non-tipped activities for more than twenty percent of their workday; that they were subject to an illegal tip pool that improperly included salaried managers; and that they were also subject to a meal credit deduction but were served meals that did not satisfy the New York state's nutritional requirements. Guevara Decl. ¶¶ 6-14; Heras Decl. ¶¶ 6-7, 9-14, 16-17. Heras also claims that she was not given any notice that a tip credit would be taken from her wages. Heras Decl. ¶ 8. In addition to recounting their own experiences, both plaintiffs state in broad terms (and identical language): "Based on my work experience and personal observations and conversations with co-workers, I know that all employees of Defendants were subject to the same wage and hour policies." Guevara Decl. ¶ 5; Heras Decl. ¶ 5. The rather skimpy details that follow, however, do not permit the Court to infer a "common policy" extending beyond the tipped employees at Fine & Rare.

Guevara states that she has knowledge of policies applicable to other employees based on her conversations with two co-workers: Eloy Candia, a busser, and "Jesus," a runner. Guevara Decl. ¶ 5. She reports that Eloy and Jesus worked at Fine & Rare and at Flatiron Room, but she does not explain how she knows that, when they worked at Flatiron Room, what positions they held there, or how they were paid at Flatiron Room. She attests that when working at Fine & Rare, both Eloy and Jesus complained to her, on unspecified dates, that "it was unfair that we were

required to do so much side-work despite only being paid at the tipped credit minimum wage." Guevara Decl. ¶ 7. Eloy also complained about the food at Fine & Rare, but said "we might as well" eat it since "Defendants would be deducting it from our wages regardless of whether we ate it or not." *Id*. ¶ 12. As to the other unlawful practices she alleges, Guevara speaks entirely in unsupported generalities. For example, she asserts: "Based on my personal observations and conversations, no other employee . . . ever received a written wage and hour notice at the time of hiring." *Id*. ¶ 12. But she does not name a single employee who did not receive (or who told her that he or she did not receive) a wage notice when hired.[7]

Heras attests that she discussed her employer's wage policies and related issues with seven co-workers: "Diana," a busser/runner/hostess; "Angel," a bartender; "Masha," a waitress; "Ishan," a waiter; "Jose," a bartender; "Chris," a waiter; and "El Colombiano," a dishwasher. Heras Decl. ¶ 5. Diana, Angel, and Jose worked at both restaurants (although Heras does not state how she knows this, when they worked at Flatiron Room, or in what positions); the others worked only at Fine & Rare. *Id*. Heras "discussed Defendants' illegal policy of not paying the proper minimum wage during our employment with other employees, particularly with Diana [LNU] and Masha [LNU] while we would be performing non-tipped side work. We would discuss how unfair it was that we were constantly paid at the tip credit minimum wage and not the regular minimum wage despite how much side work we were required to perform each shift." *Id*. ¶ 7. Heras discussed the meal deduction with El Colombiano, who "would constantly complain to me about the terrible quality of the family meals that were provided for us." *Id*. ¶ 14.

---

[7] As noted above, it appears that Guevara's co-plaintiff Heras did receive a written wage notice when hired. (Dkt. No. 80-1.)

With respect to the remaining violations described in her declaration, however, Heras provides no specifics for her repeated claim that other employees were similarly treated. *See* Heras Decl. ¶ 8 ("no other tipped employees" received legally required tip-credit notices); *id*. ¶ 11 ("all other tipped employees" were subject to an illegal tip pool); *id*. ¶ 12 ("all other employees" had meal credits improperly deducted); *id*. ¶ 15 ("other employees" worked ten-hour shifts with no spread-of-hours pay); *id*. ¶ 16 ("no other employee" received a written wage notice when hired); *id*. ¶ 17 ("other employees" received inaccurate weekly wage statements). The basis for each and every one of these statements, according to Heras, is her "personal observations and conversations with my co-workers," but no pertinent observations, or conversations, are described.

In support of plaintiffs' allegations that defendants operate both restaurants as a single integrated enterprise under the control of Tardie, plaintiffs submit – through their counsel – printouts from the Corporate Defendants' websites demonstrating that Fine & Rare and Flatiron Room are promoted as sister restaurants under the umbrella of the Goodnight Group. *See* Lee Decl. ¶¶ 4-7 & Exs. B-E. Each restaurant's website links to the other's, and each offers gift cards and tickets that can be used at the other venue. Additionally, the "team" page of the Goodnight Group LLC website identifies Tardie as the "owner and operator" of both restaurants. Lee Decl. ¶ 8 & Ex. F. Naymon is identified, on the same page, as the Director of Operations at the Goodnight Hospitality Group, with responsibility for both restaurants. *Id*.  Through Goodnight Group LLC, the restaurants also appear to share an Executive Chef, an Events Director and Events Manager, and a Beverage Director (responsible for "Spirits Education"). *Id*.

### C.     Defendants' Factual Showing

In her opposition declaration, Naymon describes the tip pool at Fine & Rare, which is "separate from the tip pool for The Flatiron Room." Naymon Decl. ¶ 7. The employees who participate in the Fine & Rare tip pool are "servers, bartenders, bussers, food runners and

barbacks." *Id.* ¶ 10. Cooks, food preparers, dishwashers, porters, and hosts are not tipped, and consequently "do not participate in the tip pool." *Id.* ¶¶ 16-20.

Naymon also describes the "family meal" offered at Fine & Rare. She attests that it is optional, and that if an employee opts out, the meal deduction is removed from that employee's paycheck. Naymon Decl. ¶ 23. She further attests that plaintiff Heras did opt out, at which point "the deduction was removed." *Id.* ¶ 24. The family meal, according to Naymon, includes all required food groups. *Id.* ¶ 25.

### D.    Conditional Certification of FLSA Collective

With respect to the non-exempt, tipped employees at Fine & Rare, I conclude that plaintiffs' declarations satisfy the "modest showing that is required of [plaintiffs] at this preliminary stage"; that is, that "they were subjected to certain wage and hour practices at the defendants' workplace and to the best of their knowledge, and on the basis of their observations, their experience was shared by members of the proposed [collective]." *Hernandez v. Bare Burger Dio Inc.*, 2013 WL 3199292, at *3 (S.D.N.Y. June 25, 2013) (quoting *Iglesias-Mendoza*, 239 F.R.D. at 368).

"There is a 'consensus in this district that where a plaintiff bases an assertion of a common policy on observations of coworkers or conversations with them, he must provide a minimum level of detail regarding the contents of those conversations or observations.'" *Racey v. Jay-Jay Cabaret, Inc.*, 2016 WL 3020933, at *4 (S.D.N.Y. May 23, 2016) (quoting *Reyes v. Nidaja, LLC*, 2015 WL 4622587, at *3 (S.D.N.Y. Aug. 3, 2015)). However, plaintiffs are not required to provide "the times and dates" of the conversations, so long as a court "'can fairly infer' that other [employees] 'labored under similar working conditions and thus suffered the same violations of the FLSA.'" *Id.* (quoting *Guzman v. Three Amigos SJL Inc.*, 117 F. Supp. 3d 516, 525 (S.D.N.Y. 2015)). In this case, the Court may fairly so infer. As described above, plaintiffs have submitted sworn declarations asserting that they – and at least some of their tipped co-workers at Fine & Rare –

were paid at the tip-credited minimum wage but were required to spend twenty percent or more of their working time on non-tipped activities; were subjected to an unlawful tip pool arrangement that improperly included salaried managers; and had a meal credit deducted from their wages, regardless of whether they ate the meal or not, for a meal that did not meet New York's nutritional requirements. Guevara Decl. ¶¶ 5-13; Heras Decl. ¶¶ 5-14.

Plaintiffs' declarations include the names (or nicknames) of the coworkers with whom they spoke, and the circumstances (if not the dates) of at least some of the conversations, during which the co-workers voiced complaints similar to those of the named plaintiffs. Although the declarations are vague in many respects, and conclusory in others (as discussed below), they are adequate to meet plaintiffs' "minimal" burden, *Damassia*, 2006 WL 2853971, at *3, of showing that the tipped employees at Fine & Rare were similarly situated with respect to the wage policies complained of. *See*, *e.g*., *Mei Rong Du v. Dingxiang Inc.*, 2020 WL 7404984, at *6 (S.D.N.Y. Dec. 17, 2020) (conditionally certifying collective based on sworn declaration of named plaintiff reporting information learned from seven other employees, identified by name or nickname, about the wages they were paid and the hours they worked); *Cuaya* 2020 WL 5494371, at *5 (conditionally certifying collective based on sworn declaration attesting that named plaintiff spoke with at least ten other employees about their wages and hours). For example, Guevara attests that while Eloy and Jesus were doing side-work with her, they "complain[ed] that the owners made tipped employees at both restaurants to do so much side work" and that the defendants "paid us terrible wages and were essentially living off of tips." Guevara Decl. ¶ 7. Similarly, Heras attests that Diana and Masha were assigned substantial side-work and complained about it, particularly Diana, who was upset because she was required to perform hostess duties but was paid only at the tip-credited minimum wage rate. Heras Decl. ¶ 7.

14

Although defendants take issue with plaintiffs' inability to provide their coworkers' full names, *see* Def. Mem. at 10, it is "not necessarily a shortcoming" that plaintiffs only identify these individuals by first name or by nickname. *Mei Rong Du,* 2020 WL 7404984, at *6; *accord Cuaya,* 2020 WL 5494371, at *5; *Zamora v. L Plus L Prods. LLC*, 2019 WL 5460559, at *5 (S.D.N.Y. Oct. 15, 2019). Moreover, at this preliminary stage, "courts regularly rely on plaintiffs' affidavits and hearsay statements in determining the propriety of sending notice." *Cuaya*, 2020 WL 5494371, at *6 (quoting *Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 563 (S.D.N.Y. 2012)). Here, plaintiffs have adequately described conversations with other employees at Fine & Rare concerning the tip-credited minimum wage, the amount of side work required, the meal deduction, and the quality of the meal. Consequently, they have satisfied their minimal burden of showing that other non-exempt tipped employees at Fine & Rare are "similarly situated" with regard to these alleged FLSA violations.[8]

### 1. Tipped Employees Only

However, to the extent the proposed collective extends to *all* non-exempt employees, plaintiffs have not satisfied their burden. An FLSA collective "may cover individuals with multiple job functions," but only if the plaintiffs have shown that all such individuals "'are subject to a common unlawful policy or practice.'" *Gomez v. Kitchenette 123 Inc.*, 2017 WL 4326071, at *5 (S.D.N.Y. Sept. 5, 2017) (quoting *Zaldivar v. JMJ Caterers, Inc.*, 166 F. Supp. 3d 310, 323 (E.D.N.Y. 2016)). In this case, plaintiffs have not made and could not make any such showing as to non-tipped employees, because the bulk of their federally cognizable complaints – as to the tip-

---

[8] As noted above, Naymon attests that the tipped employees were servers, bartenders, bussers, food runners, and barbacks. Naymon Decl. ¶¶ 10. At many restaurants, delivery persons are also tipped employees, but according to Naymon neither Fine & Rare nor Flatiron Room employs any delivery persons. *Id*. ¶ 21.

credited minimum wage they were paid, the amount of side work they were required to do, the alleged lack of notice concerning the tip credit, and the unlawful tip pooling arrangement – apply, by definition, only to tipped employees.

Similarly, almost all of the co-workers described in plaintiffs' declarations were in tipped positions. Plaintiffs do not even mention – much less provide evidence concerning – the wage policies applicable at Fine & Rare to cooks, food preparers, or porters.[9] The collective must therefore be limited to non-exempt tipped employees. *See Mei Rong Du.,* 2020 WL 7404984, at *7 (limiting collective to kitchen and pastry workers where plaintiff failed to provide "specific conversations, names, or other details" as to compensation policies applicable to other employees); *Cuaya*, 2020 WL 5494371, at *6 (S.D.N.Y. Sept. 10, 2020) (limiting collective to kitchen workers where "the only statements Cuaya makes with respect to non-kitchen staff are conclusory allegations that 'other employees were also required to work for hours for which they were not paid' and that 'no employees . . . were ever paid a spread of hours premium"); *Kitchenette 123*, 2017 WL 4326071, at *5 (limiting collective to delivery persons where eight of the nine co-workers mentioned in plaintiff's affidavit were delivery persons, as was he, and he provided "no concrete details as to any conversations with or observations of other individuals beyond those enumerated.").[10]

---

[9] The one non-tipped employee identified in plaintiffs' declarations is El Colombiano, a dishwasher, who – according to Heras – complained about the quality of the family meals. Heras Decl. ¶ 14. However, El Colombiano did not state that he was subject to an involuntary meal deduction and did not make any comment regarding the other FLSA issues described by plaintiffs.

[10] In *Kitchenette 123*, as here, the named plaintiff attempted to make up for this deficiency by attesting in broad terms that he observed "various employees being subject to wage and hour violations," beyond the individuals actually named in his declaration, and stating "generally that such observations were informed by 'conversations and experience,'" without specifying any such conversations or experiences. 2017 WL 4326071, at *5. This was "insufficient to meet his modest burden of showing that such employees may have been subject to the same wage and hour violations to which he was purportedly subject." *Id.*; *see also Jin Yun Zheng v. Good Fortune*

## 2.  Fine & Rare Only

Nor can the Court conditionally certify a collective extending beyond Fine & Rare. Where, as here, plaintiffs invoke the "single integrated enterprise" doctrine to seek conditional certification of a collective including employees of different corporate entities at different locations, they must make at least a "modest showing" that the individual restaurants, stores, or other businesses not only "share common ownership" but "treat employees, equipment, and supplies interchangeably." *Lijun Geng v. Shu Han Ju Restaurant II Corp.*, 2019 WL 4493429, at *14 (S.D.N.Y. Sept. 9, 2019) (collecting cases); *accord Cuaya*, 2020 WL 5494371, at *8. Additionally, plaintiffs must show that each location "had employees that were 'similarly situated' with regard to the allegedly unlawful . . . policies." *Trinidad*, 962 F. Supp. 2d at 557-60 (conditionally certifying a collective extending to six Pret a Manger stores rather than all 33 stores in New York City or even all ten stores at which one or more of the named plaintiffs worked); *see also Mei Rong Du*, 2020 WL 7404984, at *7 (S.D.N.Y. Dec. 17, 2020) (conditionally certifying a collective limited to kitchen workers at one of three commonly-owned and managed restaurants, because plaintiff's declaration said "nothing about the hours worked or wages paid at the restaurants other than Birds of a Feather"); *Kitchenette 123*, 2017 WL 4326071, at *6-7 (conditionally certifying a collective as to two Kitchenette locations but not as to a third, because plaintiff provided no evidence "that the specific policies he identifies . . . existed generally at all of the Kitchenette locations"); *Jing Fang*

---

*Supermarket Grp. (USA), Inc.*, 2013 WL 5132023, at *5 (E.D.N.Y. Sept. 12, 2013) (refusing to certify collective in time-shaving case where, rather than identify specific employees subject to the same unlawful policies, or otherwise explain how she knew that that her co-workers' time was shaved, plaintiff "merely restate[d] her conclusory factual allegations in a variety of forms," such as by attesting vaguely that, "[b]ased on [her] personal observation, other supermarket clerks were subject to the same time shaving policy"). So too here. Although plaintiffs claim in broad terms that "all employees" were "subject to the same wage and hour policies" and that defendants' practices were "common knowledge," Guevara Decl. ¶ 5; Heras Decl. ¶ 5, their failure to put any flesh on these bare bones is "fatal" to their effort to expand the collective beyond tipped employees. *Good Fortune Supermarket Grp.*, 2013 WL 5132023, at *5.

*Luo v. Panarium Kissena Inc.*, 2016 WL 11263668, at *9-10 (E.D.N.Y. Nov. 23, 2016), (conditionally certifying a collective extending to just three Fay Da Bakery locations, because plaintiffs "have simply not provided the Court with enough specifics to meet even the modest burden that they face at this juncture" as to other locations, and collecting cases), *report and recommendation adopted*, 2017 WL 1216571 (E.D.N.Y. Mar. 30, 2017).

Here, plaintiffs allege in conclusory (and identical) terms that that defendants "share and exchange non-exempt employees, who are shifted among the Restaurants when one is short-staffed" or to meet "other needs of Defendants," and that "[e]mployees were regularly required to transport items from and to the Restaurants, in accordance with the directives of central management," Guevara Decl. ¶ 3; Heras Decl. ¶ 3, but provide no actual evidence (direct or hearsay) as to any of these claims. Neither Guevara nor Heras was ever "shifted among the Restaurants" or "required to transport items from and to the Restaurants," and neither of them identifies any coworker to whom that happened. Moreover, although plaintiffs state that Eloy, Jesus, Diana, Angel and Jose worked at both Fine & Rare and Flatiron Room, they do not describe any conversations with these employees about their wages while working at Flatiron Room. Nor do they offer any other evidence about how the tipped staff was paid there, what side work they did, whether a meal deduction was taken, or how good the family meal was.

The mere fact that some individuals working at Fine & Rare were previously employed at a sister restaurant does not, standing alone, allow this Court to infer *either* that that those employees were "shifted among the restaurants" at management's whim *or* that employees at both locations were subject to the same allegedly unlawful wage and hour policies. *See Mei Rong Du*, 2020 WL 7404984 at *7 (plaintiff's claim that that three commonly-owned restaurants "share staff," backed only by her attestation that two employees of Birds of a Feather previously worked at one of the

other restaurants, was insufficient to extend collective beyond Birds of a Feather). Thus, although plaintiffs have shown that Fine & Rare and Flatiron Room are jointly owned, jointly promoted, and at least to some degree jointly managed, they "have simply not provided the Court with enough specifics to meet even the modest burden that they face at this juncture" to show that the specific wage and hour policies of which they complain were "uniform" across both restaurants. *Jing Fang Luo*, 2016 WL 11263668, at *9-10. Consequently, the collective will be limited to non-exempt tipped employees who worked at Fine & Rare.

### E.      Production of Potential Opt-In Plaintiff Information

Plaintiffs request that the Court direct defendants to produce contact information (including "names, titles, compensation rates, date of employment, last known mailing addresses, email addresses, and all known telephone numbers") for the employees within the conditionally certified collective. Pl. Mem. at 20. Plaintiffs seek this information in the form of an Excel spreadsheet, and request information concerning qualifying individuals who were "employed by Defendant at any point in the six (6) years prior to entry of" the Court's order. *Id*. Defendants resist furnishing email addresses, telephone numbers, or compensation rates, arguing that this would be an "unjustified intrusion into the privacy of non-parties," Def. Mem. at 16, and further contend that the contact list should extend no further than the maximum FLSA statute of limitations, which is three years. *Id*. at 13.

Courts in this Circuit "routinely grant . . . motions to compel production of the names and addresses of potentially similarly situated employees who may wish to 'opt-in' to a collective action" following conditional certification. *Anglada v. Linens 'N Things, Inc.*, 2007 WL 1552511, at *7 (S.D.N.Y. Apr. 26, 2007) (collecting cases), *report and recommendation adopted* (May 22, 2007); *accord Cortes*, 2015 WL 7076009, at *4. Moreover, it is by now fairly clear that telephone

numbers and email addresses permit a more efficient means of providing notice than mailing addresses alone, while minimally intruding on the employees' privacy. *See, e.g.*, *Diatta v. Iguana New York Ltd.*, 2016 WL 2865132, at *6 (S.D.N.Y. May 10, 2016) ("Courts routinely order discovery of names, addresses, and telephone numbers in FLSA actions."); *Racey*, 2016 WL 3020933, at *10 (ordering defendants to provide "a list of the names, addresses, telephone numbers, email addresses, and dates of employment for potential class members"). Additionally, courts commonly require the employer to disclose the potential collective members' hourly rates (which, in any event, are likely identical, at any one time, across all non-exempt tipped employees). *E.g.*, *Hernandez v. NGM Mgmt. Grp. LLC*, 2013 WL 5303766, at *5 (S.D.N.Y. Sept. 20, 2013) (ordering defendants to produce "a computer-readable list of the names, addresses, compensation rates, telephone numbers, and dates of employment" for all potential opt-in plaintiffs).

Defendants are correct, however, as to the FLSA statute of limitations, which is three years in cases of willful violations. 29 U.S.C. § 255(a); see also Notice at 2 (informing recipients that the FLSA statute of limitations is "two or three years"). The statute of limitations under the NYLL is six years, *see* NYLL § 198(3), but that does not affect plaintiffs' FLSA claims, and no NYLL class has been certified in this case. Thus, "the three-year period more effectively serves the goal of efficiency . . . and will avoid confusing individuals whose claims arise only under the NYLL." *Contrera v. Langer*, 278 F. Supp. 3d 702, 722 (S.D.N.Y. 2017) (quoting *Rojas v. Kalesmeno Corp.*, 2017 WL 3085340, at *6 (S.D.N.Y. July 19, 2017). Consequently, defendants will be required to provide a list (in Excel format if possible) limited to the names, addresses, telephone numbers, dates of employment, and current (or most recent) job titles and compensation rates for all non-exempt tipped employees who worked at Fine & Rare on or after July 11, 2017 – three years prior to the date on which this action was filed.

### F.      Content and Distribution of the Notice

"At the conditional certification stage, the district court monitors both the drafting and the distribution of the Notice of Pendency to ensure timeliness and correctness, and courts have 'broad discretion' over the details of the Notice." *Garcia Ramos v. DNC Food Serv. Corp.*, 2020 WL 2832776, at *8 (S.D.N.Y. June 1, 2020) (quoting *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 106 (S.D.N.Y. 2003)). In this case, the proposed Notice will of course require revision to conform to the scope of the collective certified by the Court. Beyond that, defendants articulate a variety of objections to the content of the Notice and to plaintiffs' distribution plans for the Notice. *See* Def. Mem. at 14-17.

In evaluating the content of an FLSA notice, a court should strive to ensure that potential opt-in plaintiffs receive "accurate and timely notice concerning the pendency of the collective action, so that [they] can make informed decisions about whether to participate." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2011) (quoting *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 323 (S.D.N.Y. 2007)). To that end, an FLSA collective notice generally should contain:

> a description of some or all of the following: (1) the purpose of the notice; (2) the nature of the lawsuit filed and the relief being sought; (3) the proposed class composition; (4) the legal effect of joining the lawsuit; (5) the fact that the court has not taken any position regarding the merits of the lawsuit; (6) how to join the lawsuit; (7) the purely voluntary nature of the decision and the legal effect of not joining the lawsuit; (8) the prohibition against retaliation; and (9) the relevant contact information for any inquiries.

*Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 566 (S.D.N.Y. 2012). Courts in this District have also held that the notice should include a warning that opt-in plaintiffs may be required to provide information, appear for deposition, or testify in court. *See id*. at 567 (modifying proposed notice to explain such a possibility).

Here, the proposed Notice contains most of the required content, including a warning about the litigation responsibilities that may come with opting in to the collective. *See* Notice at 2. It also states in general terms that plaintiffs' counsel, Lee Litigation Group, PLLC (LLG), is handling the lawsuit on a "contingency fee" basis, meaning that opt-in plaintiffs who agree to be represented by LLG will not have to pay any attorneys' fee or expenses as the lawsuit proceeds. *Id*. The Notice also states that LLG "may ask the Court to award its reasonable lodestar or up to one-third of the monetary recovery, whichever is greater." While not inaccurate, this language fails adequately to convey that, upon settlement (or after a judgment in favor of plaintiffs), the Court will evaluate any request for attorneys' fees and costs and will approve such an award only after determining that it is fair and reasonable. Plaintiffs are directed to add language to the Notice making this point clear. Likewise, although plaintiffs need not detail the specific costs and expenses that may be incurred in this litigation, the Notice should at least mention how costs will be handled in the event of a judgment in favor of defendants.

The Notice appropriately directs opt-in plaintiffs to send their consent-to-join forms to LLG rather than to the Clerk of Court, as defendants urge. *See* Def. Mem. at 14. Although some courts "have found that sending consent forms to plaintiff's counsel implicitly discourages opt-in plaintiffs from retaining their own counsel," *Mariani v. OTG Mgmt., Inc.*, 2016 WL 11670735, at *6 (E.D.N.Y. Nov. 21, 2016) (collecting cases), in this case, the potential for discouragement is "*de minimis*," *id.* at *7, because the Notice clearly advises opt-in plaintiffs that they may retain their own counsel. *See* Notice at 2 ("You are not required to have Lee Litigation Group, PLLC represent you.").

Defendants request that the Notice include contact information for defense counsel, as well as plaintiffs' counsel, which – they say – would provide "another source of information for notice

recipients." Def. Mem. at 15. Plaintiffs object, arguing that adding contact information for defendants' counsel "is likely to create confusion." Pl. Reply at 9-10. Courts in this District, although not wholly unanimous on the point, "'have generally concluded' that the contact information of defendants' counsel 'is appropriate for inclusion in a notice of collective action.'" *Benavides v. Serenity Spa NY Inc.,* 166 F. Supp. 3d 474, 486–87 (S.D.N.Y. 2016) (quoting *Bittencourt v. Ferrara Bakery & Cafe Inc.*, 310 F.R.D. 106, 118 (S.D.N.Y. 2015)); *see also She Jian Guo v. Tommy's Sushi Inc.*, 2014 WL 5314822, at *4 (S.D.N.Y. 2014) ("Inclusion of such information is routine."). Plaintiffs shall therefore add the names and contact information of defendants' attorneys to the Notice. The Notice should also advise opt-in plaintiffs that once they are represented by counsel (whether LLG or other attorneys), they should not contact defendants' lawyers personally, but should instead rely on their own counsel to do so. *See Benavides*, 166 F. Supp. 3d at 487; *Cohan v. Columbia Sussex Mgmt.,* 2013 WL 8367807, at *13 (E.D.N.Y. Sept. 19, 2013), *aff'd*, 2016 WL 1045532 (E.D.N.Y. Mar. 15, 2016).

Plaintiffs propose sending the Notice to members of the collective in Spanish as well as English. Pl. Mem. at 1, 20-21. "Generally, courts permit notice to be 'translated into the mother tongue of non-English speaking groups of potential plaintiffs.'" *Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 76 (E.D.N.Y. 2016) (quoting *Colon v. Major Perry Street Corp.*, 2013 WL 3328223, at *8 (S.D.N.Y. July 2, 2013)); *accord Sanchez v. El Rancho Sports Bar Corp.*, 2014 WL 1998236, at *5 (S.D.N.Y. May 13, 2014) (Spanish-language notice forms permitted). Here, plaintiffs contend in their brief that many of their coworkers are Spanish speakers. Pl. Mem. at 21. Although there is no evidentiary support for this proposition in plaintiffs' declarations, defendants have not objected to the translation plan. Consequently, the Court adopts plaintiffs' proposal and will direct their counsel to have the Notice translated into Spanish for dissemination.

Plaintiffs request that the Court approve the "distribution" of the Notice, *see* Mot. Ex. 1, ¶ 2, but do not specify the means of distribution. "Courts in the Second Circuit have permitted dissemination of notice by mail, email, and text message 'where, as here, the nature of the employer's business facilitated high turnover rate among employees.'" *Chui v. Am. Yuexianggui* of *LI LLC*, 2020 WL 3618892, at *10 (E.D.N.Y. July 2, 2020) (quoting *Vasto v. Credico (USA) LLC*, 2016 WL 2658172, at *16 (S.D.N.Y. May 5, 2016)); *see also Qiang Lu v. Purple Sushi Inc.*, 447 F. Supp. 3d 89, 97 (S.D.N.Y. 2020). For avoidance of doubt, this Court will authorize plaintiffs' counsel to disseminate the Notice by mail, email, and/or text message. However, to protect potential collective members from undue annoyance, counsel shall not contact any individual more than twice during the 60-day opt-in period via any one channel of communication.

Defendants will also be required to post the Notice, in English and Spanish, at Fine & Rare, in a location easily accessible to tipped employees. Defendants resist doing so, arguing that posting the Notice on premises will be "disruptive" to their operations and unnecessary, as they "necessarily maintain accurate address information" for current employees. Def. Mem. at 16. Many employers raise such objections in FLSA cases. Most courts, however, reject them, as I do here, concluding that any "disruption" would be minimal, and outweighed by the advantages of making the Notice easily available to all current employees. *See, e.g., Chui,* 2020 WL 3618892, at *11 (collecting cases); *Qiang Lu*, 447 F. Supp. 3d at 97; *Whitehorn*, 767 F. Supp. 2d at 449; *Trinidad*, 962 F. Supp. 2d at 564.

### G.    Equitable Tolling

Ordinarily, the statute of limitations on an FLSA claim "continues to run with respect to each potential plaintiff's collective action claim until that plaintiff files the written consent form opting into the suit." *Whitehorn*, 767 F. Supp. 2d at 449; *see also* 29 U.S.C. § 256. In a collective action, equitable tolling of the statute of limitations may be warranted to avoid "inequitable

circumstances" where individual plaintiffs have acted with "reasonable diligence in pursuing their claims," but where, due to the passage of time between the filing of the action and the dissemination of a notice of pendency, "a substantial number of class members may now be time-barred" through no fault of counsel or the class representative. *Jackson*, 298 F.R.D. at 170.

Here, plaintiffs proactively request that the FLSA statute of limitations be continuously tolled, for all collective members, "until such time that Plaintiffs are able to send notice to potential opt-in plaintiffs." Pl. Mem. at 21. However, plaintiffs first filed their collective certification motion more than one year after they initiated this action, and it has now been pending and fully briefed for only three and a half months. *Cf. Jackson*, 298 F.R.D. at 170-71 (where plaintiffs filed their certification motion "shortly after the filing of the complaint," but it was not decided for "more than seven months" after briefing was completed, court tolled statute of limitations for a limited period of time, "as of the date of filing" of the motion).

Because "the application of the equitable tolling standard is 'highly case-specific,'" the "burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." *Contrera v. Langer*, 278 F. Supp. 3d 702, 726 (S.D.N.Y. 2017) (quoting *Wilder v. U.S. Dep't of Veterans Decairs*, 175 F. Supp. 3d 82, 90 (S.D.N.Y. 2016)). At present, nothing about this case presents the kind of "rare and exceptional circumstances" that would merit equitable tolling. *See Andon v. SDG Props., Inc.*, 2018 WL 3970910, at *3 (S.D.N.Y. Aug. 20, 2018) ("Equitable tolling is appropriate only in rare and exceptional circumstances . . . where a plaintiff has been prevented in some extraordinary way from exercising his rights.") (internal quotations omitted). Consequently, the Court agrees with defendants, *see* Def. Mem. at 13-14, that plaintiffs have not demonstrated any entitlement to a blanket tolling rule. The Court's decision on this point is without prejudice to a later application for equitable tolling by one or more individual plaintiffs, should

their own cases so warrant. *See, e.g., Cuaya*, 2020 WL 5494371, at *13-14 (denying equitable tolling without prejudice because plaintiff "failed to allege that any potential opt-in plaintiff exists 'who intends to join the collective but who risks becoming time-barred or has been prevented in some extraordinary way from exercising his rights'").

## III.   CONCLUSION

For the foregoing reasons, plaintiffs' motion for conditional collective certification (Dkt. No. 60) is GRANTED as to all former and current non-exempt tipped employees who worked at Fine & Rare restaurant on or after July 11, 2017, and otherwise DENIED.

No later than two weeks from the date of this Memorandum and Order:

1.   Defendants shall produce a spreadsheet, in Excel format if possible, containing the names, last known mailing addresses, email addresses, and telephone numbers, dates of employment, current or most recent job title, and current or most recent compensation rate, for all current and former non-exempt, tipped employees who worked at Fine & Rare restaurant on or after July 11, 2017; and

2.   The parties shall, after meeting and conferring, prepare and submit to the Court, for its approval, a revised form of Notice (including the related opt-in form), and a proposed distribution order, incorporating the Court's rulings.

Dated: New York, New York
     January 10, 2022                    **SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**

26